UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA,

-v-

JUSTIN RIVERA,

Defendant.

---

19 Cr. 131 (PAE)

OPINION & ORDER

PAUL A. ENGELMAYER, District Judge:

This decision resolves post-trial motions filed by defendant Justin Rivera.

Beginning June 2, 2021, the Court presided over Rivera's jury trial, involving a single charge of conspiracy to commit sex trafficking by force, fraud, or coercion, in violation of 18 U.S.C. § 1594(c). On June 10, 2021, at the close of the Government's case, the Court denied Rivera's motion for a judgment of acquittal, pursuant to Federal Rule of Criminal Procedure 29(a). On June 11, 2021, the jury returned its verdict of guilty. On August 2, 2021, Rivera timely moved for a judgment of acquittal under Rule 29(c), or, in the alternative, for a new trial under Rule 33. Dkt. 881; *see also* Dkt. 882 ("Rivera Mem."). On September 20, 2021, the Government opposed the motions. Dkt. 912 ("Gov. Mem.").

For the reasons that follow, the Court denies Rivera's motions.

## I.      Governing Legal Standards

### A.      Rule 29 Motions

To grant a motion for acquittal under Rule 29, the Court must find that the evidence was legally insufficient to establish the defendant's guilt beyond a reasonable doubt. *See United States v. Teman*, 465 F. Supp. 3d 277, 291 (S.D.N.Y. 2020). "A defendant challenging the

sufficiency of the evidence that was the basis of his conviction at trial bears a heavy

burden." *United States v. Heras*, 609 F.3d 101, 105 (2d Cir. 2010) (internal quotation marks

omitted); *United States v. Hawkins*, 547 F.3d 66, 70 (2d Cir. 2008); *United States v. Desena*, 287

F.3d 170, 177 (2d Cir. 2002).  "The question is not whether this Court believes that the evidence

at trial established guilt beyond a reasonable doubt, but rather, whether *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt." *United States*

*v. Mi Sun Cho*, 713 F.3d 716, 720 (2d Cir. 2013) (per curiam) (emphasis in original) (alteration

and internal citations omitted).  In a close case, where "either of the two results, a reasonable

doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the

matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (alteration and citation

omitted).  It is not the trial court's role to "substitute its own determination of . . . the weight of

the evidence and the reasonable inferences to be drawn for that of the jury." *United States v.*

*Guadagna*, 183 F.3d 122, 129 (2d Cir. 1999) (alteration in original) (quoting *Curley*

*v. United States*, 160 F.2d 229, 232 (D.C. Cir. 1947)).  Accordingly, a "court may enter a

judgment of acquittal only if the evidence that the defendant committed the crime alleged is

nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable

doubt." *United States v. Espaillet*, 380 F.3d 713, 718 (2d Cir. 2004) (citation omitted).

In considering the sufficiency of the evidence supporting a guilty verdict, the Court must

view the evidence in the light most favorable to the Government, with all reasonable inferences

drawn in its favor.  *See Hawkins*, 547 F.3d at 70; *Mi Sun Cho*, 713 F.3d at 720; *United States v.*

*Howard*, 214 F.3d 361, 363 (2d Cir. 2000) ("[We] resolve all inferences from the evidence and

issues of credibility in favor of the verdict.").  "[T]he task of choosing among competing,

permissible inferences is for the [jury], not for the reviewing court." *United States v.*

*McDermott*, 245 F.3d 133, 137 (2d Cir. 2001). Moreover, the Court must analyze the pieces of

evidence "not in isolation but in conjunction," *United States v. Matthews*, 20 F.3d 538, 548 (2d

Cir. 1994), and must apply the sufficiency test "to the totality of the government's case and not

to each element, as each fact may gain color from others," *Guadagna*, 183 F.3d at 130; *see

also United States v. Reyes*, 302 F.3d 48, 53 (2d Cir. 2002) ("[W]e consider the evidence as a

whole.").

The credibility of a testifying witness is particularly within the province of the jury, not a

reviewing court. *See United States v. O'Connor*, 650 F.3d 839, 855 (2d Cir. 2011) ("It is the

province of the jury and not of the court to determine whether a witness who may have been

inaccurate, contradictory and even untruthful in some respects was nonetheless entirely credible

in the essentials of his testimony." (internal quotation marks omitted)). For these reasons, the

Second Circuit has emphasized that "the proper place for a challenge to a witness's credibility is

in cross-examination and in subsequent argument to the jury, not in an appellate brief." *United

States v. Roman*, 870 F.2d 65, 71 (2d Cir. 1989) (cleaned up). It is for the jury to decide how

those arguments bear on "the weight [it] should accord to the evidence." *United States v.

Truman*, 688 F.3d 129, 140 (2d Cir. 2012).

The jury is, further, permitted to give substantial weight to a single witness's testimony.

"[A] conviction may be sustained on the basis of the testimony of a single accomplice, so long as

that testimony is not incredible on its face and is capable of establishing guilt beyond a

reasonable doubt." *United States v. Diaz*, 176 F.3d 52, 92 (2d Cir. 1999) (internal quotation

marks omitted). "Any lack of corroboration of an accomplice's or co-conspirator's testimony

goes merely to the weight of the evidence, not to its sufficiency, and a challenge to '[t]he weight

3

is a matter for argument to the jury, not a ground for reversal on appeal.'" *Id.* (quoting *Roman*, 870 F.2d at 71).

The deference accorded to the jury's verdict "is especially important when reviewing a conviction of conspiracy . . . because a conspiracy by its very nature is a secretive operation, and it is a rare case where all aspects of a conspiracy can be laid bare in court with the precision of a surgeon's scalpel." *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992) (internal quotation marks omitted). "A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the parties have a tacit understanding to carry out the prohibited conduct," *United States v. Samaria*, 239 F.3d 228, 234 (2d Cir. 2001) (quoting *Thomas v. Roach*, 165 F.3d 137, 146 (2d Cir. 1999)), *abrogated on other grounds by United States v. Huezo*, 546 F.3d 174, 180 n.2 (2d Cir. 2008), and can be shown based on circumstantial evidence alone, *United States v. Gordon*, 987 F.2d 902, 906–07 (2d Cir. 1993); *see also United States v. Glenn*, 312 F.3d 58, 64 (2d Cir. 2002) ("[T]he prosecution may prove its case entirely by circumstantial evidence so long as guilt is established beyond a reasonable doubt."); *United States v. Miranda-Ortiz*, 926 F.2d 172, 176 (2d Cir. 1991) ("Membership in the conspiracy may be proven entirely by circumstantial evidence."). For example, a defendant's "knowing and willing participation in a conspiracy may be inferred from . . . [his] presence at critical stages of the conspiracy that could not be explained by happenstance, or a lack of surprise when discussing the conspiracy with others." *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 93, 113 (2d Cir. 2008) (first alteration in original) (internal quotation marks and citation omitted).

4

### B.      Rule 33 Motions

Rule 33 provides that a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). The Rule "confers broad discretion upon a trial court to set aside a jury verdict and order a new trial to avert a perceived miscarriage of justice." *United States v. Sanchez*, 969 F.2d 1409, 1413 (2d Cir. 1992). However, "motions for a new trial are disfavored in this Circuit." *United States v. Gambino*, 59 F.3d 353, 364 (2d Cir. 1995). In exercising its discretion, a court must be careful not to wholly usurp the role of the jury, and should defer to the jury's assessment of witnesses and resolution of conflicting evidence unless "exceptional circumstances can be demonstrated." *See Sanchez*, 969 F.2d at 1414; *Teman*, 465 F. Supp. 3d at 292.

"[A] district court may not grant a Rule 33 motion based on the weight of evidence alone unless the evidence preponderates heavily against the verdict to such an extent that it would be a 'manifest injustice' to let the verdict stand." *United States v. Archer*, 977 F.3d 181, 188 (2d Cir. 2020) (quoting *Sanchez*, 969 F.2d at 1414); *United States v. Ferguson*, 246 F.3d 129, 134 (2d Cir. 2001). The court should "examine the entire case, take into account all facts and circumstances, and make an objective evaluation." *Ferguson*, 246 F.3d at 134. After doing so, "[t]here must be a real concern that an innocent person may have been convicted" in order to grant the motion. *Sanchez*, 969 F.2d at 1414. The court's Rule 33 authority should be used "sparingly" and only "in the most extraordinary circumstances." *Ferguson*, 246 F.3d at 134 (quoting *Sanchez*, 969 F.2d at 1414).

## II.  Discussion

The Court assumes familiarity with the evidence adduced at trial. The discussion that follows presents only the evidence necessary to resolve the motions at hand.[1]

### A.  Rivera's Rule 29 Motion

In moving for a judgment of acquittal, Rivera contends that the evidence was insufficient to establish each of the two elements of the offense of conspiracy to commit sex trafficking: (1) the existence of an agreement or understanding to violate the federal law that makes it a crime to commit sex trafficking; and (2) that Rivera knowingly and willfully became a member of that conspiracy. *See* Tr. 1781–82 (instructing jury as to these elements).[2]  Rivera also argues that there was insufficient evidence of venue in this District. These arguments are quickly put to rest.

#### 1.  Existence of an Agreement to Engage in Sex Trafficking

The Indictment charged a conspiracy among Rivera, Lorenzo Randall, Dwayne Conley, and Brian Smith to sex-traffic multiple women by means of violence, threats of violence, coercion, and fraud. The charges resulted from a period in 2015 when Rivera, Randall, and others squatted in a home in Bohemia, New York. As narrowed for Rivera's trial, the conspiracy charge focused on two women: Dajia Perez, who was predominantly trafficked by Randall, and Natalie Rodriguez, who was predominantly trafficked by Rivera.

The evidence at trial not only sufficiently, but overwhelmingly, showed that each woman had been trafficked by such means, and that a conspiracy existed among Rivera and his close

---

[1] The Government's summary in its opposition to Rivera's motions, however, provides a fair and accurate overview of the evidence adduced in its case-in-chief. *See* Gov. Mem. at 1–9.

[2] "Tr." refers to the trial transcript; "GX" refers to exhibits offered by the Government at trial.

friend Randall to traffic each woman.[3]  The evidence centered on the extended testimony of both

Perez and Rodriguez, and the testimony of Perez's mother, as corroborated by contemporaneous

text messages, social media posts, and recorded phone calls.[4]  Although to sustain the conspiracy

count, it was necessary only that there be sufficient evidence of a conspiracy including Rivera to

sex-traffic one victim, there was compelling evidence that Rivera and Randall collaborated and

assisted in the trafficking of each.

*Perez*:  As to Perez, Randall recruited her to work as a prostitute in May 2015, shortly

after she turned 18, based on various false promises.  She lived with Randall and Rivera at the

Bohemia House for approximately four months, until September 2015, and she engaged in

commercial sex acts at Randall's behest multiple times daily.  Randall directed Perez to give him

all the money she made for selling her body.  *See generally* Tr. 85, 90–92, 95–105, 110–15.

The assembled evidence gave the jury an ample basis on which to infer the existence of a

conspiracy among, at least, Rivera and Randall to sex-traffic Perez.[5]  Rivera accompanied

Randall as a source of potential protection when Randall took Perez on "dates" in which she

engaged in sex acts with customers, Tr. 117–18, went to hotels with Perez and Randall at which

Perez got ready for such "dates," Tr. 371, and spoke routinely with Randall about Perez's

prostitution, Tr. 1137.  Critically, Rivera was present, and supported Randall, when Randall

---

[3] Although the trial proof focused on Rivera and Randall, there was also evidence that Conley and Smith participated in the conspiracy.  Given the ample evidence of a conspiracy among Rivera and Randall, the Court does not have occasion here to chronicle or evaluate the evidence as to the other co-conspirators.

[4] There was also testimony from an expert psychologist on trauma-bonding in the context of relationships between sex-traffickers and their victims.

[5] In summation, the defense conceded that Perez had been sex-trafficked by Randall, while disputing that Rivera had conspired with Randall as to her trafficking.  Tr. 1689.

engaged in violence and threats thereof against Perez that caused her to engage in prostitution. Tr. 166–67, 170, 176, 1135–36. To Perez, Randall described Rivera as "the shooter"—as the person who would "handle it" if "something was happening." Tr. 228. Consistent with that, Perez observed that in her presence, Rivera "always had a gun on him," Tr. 370; *see also* Tr. 228, and often brandished it, which inspired fear and submissiveness in her, Tr. 246, 267–68.

Perhaps most dramatically, when Perez's mother came to the Bohemia House in an effort to rescue and retrieve her daughter, Rivera stood outside the house and wielded a large firearm, with the evident intent to intimidate Perez and her mother as they stood in the driveway. To the same effect, after the mother drove Perez away, Randall sent Perez threatening text messages. Hours later, out of fear that Randall and Rivera would do violence to her and her family if she did not return to the Bohemia House, Perez returned, and went back to working as Randall's prostitute. Tr. 287, 291–99, 301–10, 607, 609, 611.

On another occasion, Rivera stood watch outside a motel room, with the door slightly ajar, while Randall viciously beat Perez and strangled her to the point that she thought she was going to die. Rivera had had his gun on him as he accompanied Randall and Perez to the room. Rivera's armed presence reinforced Randall's use of physical force as a means to coerce Perez into continued prostitution. Tr. 372–78, 606.

Finally, in September 2015, when Perez had resolved to leave the Bohemia House, Rivera took steps on Randall's behalf to convince her to return to work as Randall's prostitute. Rivera exchanged text messages with Perez urging her to return to Randall, and sent copies of these messages to Randall. Rivera also asked his primary victim, Rodriguez, who knew Perez from their overlapping time at the Bohemia House, to "text [Perez] and tell her to come back because [Randall] needs her." Tr. 1266–67; GX 123, 124.

*Rodriguez*: As to Rodriguez, Rivera lured her, a second cousin of his, into prostitution, with promises of romance with him and money. Like Perez, Rodriguez was harbored at the Bohemia House, where she lived for several multi-week stretches with Rivera and Randall between May and October 2015. During that period, at Rivera's direction, on many days, she went on multiple "dates" with customers. Rivera posted online advertisements for Rodriguez and typically decided how many dates she would go on. He typically kept for himself, or tried to keep, the proceeds of Rodriguez's prostitution. *See generally* Tr. 1020, 1024–25, 1027, 1031, 1037, 1044–45, 1118, 1195, 1496, 1504.

Much as Rivera had assisted Randall in controlling Perez, there was substantial evidence that Randall assisted Rivera in his trafficking of Rodriguez. Rivera sought and obtained advice from Randall on how to maximize profits and control Rodriguez. Tr. 1137–38. Randall advised Rivera on how to create online advertisements for Rodriguez's prostitution and to make more money from her sex work. Tr. 316–18. The two men, at night, met in the kitchen of the Bohemia House to discuss the number of dates on which their respective prostitutes had gone and the money that had been made; Rivera sometimes told Rodriguez the amount of money Randall was making off of Perez's prostitution to pressure Rodriguez to make more money. Tr. 1447–48.

Rivera also sought and obtained guidance from Randall as to how to exercise control over Rodriguez, with Randall telling him to "boss up" on, "dominate," and "be more assertive" to Rodriguez, including, if necessary, by "hitting her and physically harming her to make her respect" Rivera. Tr. 140–44, 146, 207, 316–18. Rodriguez's testimony supported that Rivera acted in accord with this advice. Over time, he became more aggressive toward and exercised more control over Rodriguez, and began to abuse her verbally and physically, including giving

her a black eye. She was left fearful that if she stopped working for Rivera, "he would further hurt me physically or maybe come after my family or have someone else so do it." Just as Rivera had brandished his gun to intimidate Perez and her mother, when Rodriguez disobeyed or angered him, he pointed his gun at her head and waved it around while threatening to kill her. Tr. 1025, 1027, 1057–58, 1121–22.

Finally, after Rivera was arrested in October 2015 and remanded to custody, Randall assisted Rivera in his attempts to persuade Rodriguez to continue to work as a prostitute for Rivera. At Rivera's instruction, Rodriguez brought the proceeds of her sex work either to Rivera in jail or to Randall outside the jail. And on "dates" that Rodriguez went on during this period, Randall served as her driver. Randall told Rodriguez that he was acting at Rivera's behest, and that he "wouldn't do anything" in connection with Rodriguez's prostitution "without . . . Justin's permission." Tr. 1255–58, 1269–71.

***Other evidence of conspiratorial collaboration***: There was other evidence supporting the inference of the claim of a sex-trafficking conspiracy between Randall and Rivera. On one occasion, witnessed and recounted by Perez, Randall knocked "Shay," a prostitute working for Randall, to the floor and dragged her by her hair through the Bohemia House; Randall and Rivera then laughed in Perez's presence about Randall's violence towards Shay. After this display of intimidation, Shay and Perez left the Bohemia House with Randall and Rivera to go on "dates" where they engaged in commercial sex acts for Randall. Tr. 349–50, 353–55. And, along with Conley and Smith, Randall and Rivera held themselves out as a members of a group styled the "Yacht Club," and branded their clothing and social media posts (and Perez, via a tattoo she later tried to obliterate) with an anchor symbol. Based on statements made by the men, Perez understood this group to be united by their prostitution of women. Rivera posted a

10

video on social media stating that the Yacht Club was "out here getting this paper," which Rodriguez understood to mean that the Yacht Club members were "making money prostituting and selling drugs." Tr. 235–36, 357–62, 382, 386, 636, 998–1001, 1205–06; GX 104A, 1014A.

In sum, contrary to Rivera's first argument in support of his Rule 29(c) motion, there was abundant evidence of a sex-trafficking conspiracy among, at least, Randall and Rivera with respect to Perez and Rodriguez. Apart from the direct evidence of collaboration in prostituting the two women, the common means and methods by which the two women were trafficked supported the inference of an agreement. These included the use of the Bohemia House as the hub of the sex-trafficking venture and the place at which the victims were harbored; the use of a common means of advertising the victims' availability (posting advertisements on the Backpage internet site); the sharing of tips and best practices at how to succeed at sex trafficking; and the assistance to each other in managing and coercing each other's victims.

In the face of this considerable body of proof, Rivera notes that there was no evidence adduced as to profit-sharing or a formal business operation among Randall and Rivera. But, for a conspiracy to be found, proof of profit-sharing or formalities was not required. *See, e.g.,* *United States v. Henry*, 325 F.3d 93, 105 (2d Cir. 2003) ("[I]t is not necessary . . . that each conspirator . . . ha[d] a 'stake in the success' of the conspiracy. . . . Rather, the government *may* establish [participation in a conspiracy] by showing that the defendant had a financial stake." (emphasis in original)); *United States v. Garcia*, 509 F. App'x 40, 42 (2d Cir. 2013) (summary order) (defendant need not have had financial stake in venture to be convicted of conspiracy); *United States v. Ulbricht*, 31 F. Supp. 3d 540, 561 (S.D.N.Y. 2014) ("[M]embers of a conspiracy may serve different roles."). And here, in fact, there was abundant evidence that both Rivera and

Randall profited.  As the evidence showed, each secured all, or virtually all, the fruits of the sex

work of the victim that each—with the assistance of the other—principally prostituted.

Rivera also seizes on evidence of a degree of competition among Rivera and Randall as

to the profits they made.  But that too did not preclude the jury from finding a conspiracy based

on the proof at hand.  The jury was at liberty to find that, notwithstanding this friendly

competition, the two men shared, and collaborated to further, the goal of prostituting the victims

housed in the Bohemia House, including Perez and Rodriguez.  The men's competition was not

antithetical to their mutual interest in successfully coercing—through means such as force,

violence, and the threat thereof—these women to work to engage in commercial sex work.  *See*

*United States v. Moore*, 322 F. App'x 78, 82–83 (2d Cir. 2009) (summary order) (affirming

conspiracy conviction notwithstanding drug dealers' "sometimes competing interests," where

evidence supported that they "were working together toward the shared goal of distributing crack

cocaine," helping each other in some respects while competing in others).

## 2.  Rivera's Participation in the Conspiracy

Rivera separately argues that, even if there were sufficient evidence of a sex-trafficking

conspiracy, there was insufficient evidence of his having joined in it.  For much the same reasons

chronicled above, that argument lacks merit.  Quite to the contrary, the concrete acts chronicled

above on Rivera's part, whether undertaken in connection with the sex trafficking of Rodriguez

or Perez or both, supplied overwhelming evidence on which a jury could infer Rivera's knowing

agreement with (at a minimum) Randall to participate in the charged sex-trafficking conspiracy.

The steps from which a reasonable jury could infer, as required, an explicit or implicit

mutual understanding to achieve the specified unlawful objective charged, *see United States v.*

*Scott*, 979 F.3d 986, 990 (2d Cir. 2020), included:

- Rivera's active—daily or near-daily—steps during a four-month period to manage Rodriguez's commercial sex work, with the assistance and guidance furnished by Randall, as chronicled above;

- Rivera's assistance to Randall during a four-month period with respect to Perez's commercial sex work, including wielding a firearm at Perez's mother, holding a firearm outside the door to the motel room in which Randall nearly choked Perez to death, and recruiting her to return to sex work;

- Rivera's direction to Rodriguez to allow Randall to manage her prostitution activities while Rivera was in custody;

- Rivera's request for, and receipt of, guidance from Randall on how best to exercise control over Rodriguez to further the goal of sex-trafficking her; and

- Rivera and Rodriguez's exchanges of updates on the success of their sex-trafficking efforts, including sharing information regarding the money they earned, where they were earning it, and how they were earning it.

In light of the many acts in furtherance of the conspiracy on Rivera's part, his suggestion that the evidence supported his mere passive presence in a conspiracy engaged in by others is easily put aside. *See United States v. Rivera*, No. 09 Cr. 619 (SJF), 2012 WL 2339318, at *7 (E.D.N.Y. June 19, 2012) (upholding conviction for sex-trafficking conspiracy where defendant "acquiesced and participated in arrangement to transport, coerce and entice" women to engage in prostitution); *see also, e.g., United States v. Murray*, 618 F.2d 892, 903 (2d Cir. 1980) ("A single act may be sufficient for an inference that an individual is involved in a conspiracy; the qualitative nature of the act viewed in the context of the entire conspiracy determines whether that inference can be drawn in a particular case.") (cleaned up).  Indeed, Rivera's active

13

facilitation of the conspiracy, as to both victims, far exceeds the conduct of defendants in cases in which the Second Circuit has rejected "mere presence" defenses. *See, e.g.*, *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d at 113 (defendant's participation in conspiracy may be inferred from "presence at critical stages of the conspiracy" and "participat[ion] in conversations directly related to the substance of the conspiracy"); *United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998) (explaining that presence may establish membership "if all the circumstances considered together show that by [defendant's] presence he meant to advance the goals of that conspiracy") (quoting *United States v. Giraldo*, 80 F.3d 667, 673 (2d Cir. 1996)); *United States v. Aleskerova*, 300 F.3d 286, 293 (2d Cir. 2002) ("A defendant's knowing and willing participation in a conspiracy may be inferred from, for example, her presence at critical stages of the conspiracy that could not be explained by happenstance.").

### 3. Venue

The final basis for Rivera's motion under Rule 29 is his claim that venue was lacking in this District. That argument fails. The evidence at trial indeed lopsidedly involved conduct in the Eastern District of New York—the site of the Bohemia house and the principal locus of the victims' commercial sex acts. But proper venue does not depend on whether the district in which the defendant was tried is the one in which the plurality of relevant events occurred. Rather, "[v]enue may lie in more than one place if 'the acts constituting the crime and the nature of the crime charged implicate more than one location.'" *United States v. Lange*, 834 F.3d 58, 68–69 (2d Cir. 2016) (quoting *United States v. Reed*, 773 F.2d 477, 480 (2d Cir. 1985)). Such was so here.

"Both the Sixth Amendment and Fed. R. Crim. P. 18 require that a defendant be tried in the district where his crime was committed." *United States v. Rutigliano*, 790 F.3d 389, 395 (2d

Cir. 2015) (cleaned up).  As the Second Circuit has observed, "[t]he challenge, of course, comes in determining what 'committed' means for the purposes of a specific crime." *United States v. Kim*, 246 F.3d 186, 191 (2d Cir. 2001).  To do so, courts look to "the nature of the crime alleged and the location of the act or acts constituting it." *United States v. Magassouba*, 619 F.3d 202, 205 (2d Cir. 2010) (quoting *United States v. Cabrales*, 524 U.S. 1, 5 (1998)); *see also Kim*, 246 F.3d at 191 ("[T]he Supreme Court directed courts to . . . identify the conduct constituting the offense and then determine where that conduct occurred.").

In the context of a conspiracy case, "venue is proper in any district in which an overt act in furtherance of the conspiracy was committed," meaning "any act performed *by any conspirator* for the purpose of accomplishing the objectives of the conspiracy." *United States v. Tzolov*, 642 F.3d 314, 319–20 (2d Cir. 2011) (internal quotation marks omitted) (emphasis added).  The Government has the burden of proving venue, but, because venue is not an element of a crime, it must be proven by only a preponderance of the evidence. *United States v. Ramirez*, 420 F.3d 134, 139 (2d Cir. 2005).  The court must view the evidence "in the light most favorable to the government, crediting 'every inference that could have been drawn in its favor.'" *Id.* (quoting *United States v. Rosa*, 17 F.3d 1531, 1542 (2d Cir. 1994)).

Here, as the Government rightly notes, there were at least two instances that provided a solid basis for venue in the Southern District of New York.  First, Perez squarely testified that Randall took her on a "date" with a commercial sex customer in Manhattan.  She recalled details of the date, including the amount the customer paid ($750), the demeanor of the customer ("[h]e was super eccentric" and "all over the place") and the length of the date ("he asked me to stay an extra hour").  Tr. 119–20.  And despite cross-examination attempting to cast doubt on the site of this date, Perez was firm that the date took place in Manhattan, the borough in which, she noted,

she had attended elementary school. Tr. 629–30, 635. Second, Perez testified that, on a separate occasion, Randall drove Perez to the Bronx, for the purpose of going on a date there. Tr. 421–23.[6] These incidents fell within the conspiracy as charged and supplied a sufficient basis for venue. *See, e.g.*, *United States v. Kloszewski*, 760 F. App'x 12, 16 (2d Cir.) (summary order), *cert. denied*, 139 S. Ct. 2629 (2019) (venue proper where defendant discussed plans, and thereby committed an overt act, on phone call with coconspirators who were in the Southern District of New York); *United States v. Kirk Tang Yuk*, 885 F.3d 57, 71–72 (2d Cir. 2018) (evidence sufficient for venue where defendant "drove over the Verrazano-Narrows Bridge from Staten Island to Brooklyn, passing . . . through the jurisdiction of the Southern District of New York"); *United States v. Garcia*, 112 F.3d 506 (tbl.), 1997 WL 196597 at *4 (2d Cir. 1997) (venue proper where the defendant caused cocaine "to be trucked through the Southern District of New York en route" to Queens); *United States v. Ramirez-Amaya*, 812 F.2d 813, 816 (2d Cir. 1987) ("The coconspirators met in Manhattan, which is within the Southern District, in order to make final arrangements for the collection of the cocaine after its transport to New York," providing venue).

### B.    Rivera's Rule 33 Motion

Finally, Rivera seeks a new trial under Rule 33. The sole reason he offers for why justice requires vacating his conviction in favor of a new trial, Fed. R. Crim P. 33(a), is that the verdict was, ostensibly, against the weight of the evidence, Rivera Mem. at 13.

---

[6] There was also evidence that Rivera made efforts to lure Perez to return to the Bohemia House from the Bronx after she had moved there to escape Randall. Tr. 655; GX 124. The record did not, however, establish that, in the course of these efforts, Rivera had entered the Bronx, although Rivera made contact with her while she was there. *Cf.* Tr. 479. The Court's holding that venue was proper does not turn on this aspect of the trial proof.

That assessment is wrong. The evidence did not "preponderate[] heavily against the verdict to such an extent that it would be a 'manifest injustice' to let the verdict stand." *Archer*, 977 F.3d at 188. Far from it. The assembled evidence overwhelmingly established Rivera's guilt. Both victims, Perez and Rodriguez, testified, credibly and concretely, that they had been caused to undertake and/or persist in commercial sex work by means of force, fraud, and coercion at the hands of Randall and Rivera. Each victim's account was heavily corroborated by documentary evidence (including telltale text messages and social media posts). Each victim's account was further corroborated by photographs (including of Rodriguez bearing a black eye inflicted by Rivera, and of Rivera in the Bohemia House bearing a firearm identified as consistent with the firearm he brandished in the presence of Perez and her mother). Importantly, too, each victim's account was corroborated by the testimony of the other. The victims met each other at the Bohemia House, and to a limited degree observed the other interact with members of the alleged conspiracy. Their testimony was consistent both as to the general pattern of behavior among Randall and Rivera and others within the Bohemia House, and as to facts regarding the other victim. And although the evidence as to each victim revealed a complex relationship with her primary trafficker in which the trafficker's violence, coercion, deceit, and cultivation of the victim's dependency coexisted with moments of mutual or unilateral affection, the relationships were entirely compatible with the allegations in the Indictment.

Nor does—or could—Rivera claim any unfairness in the process by which he was tried. The opposite is so. Rivera had the benefit, pretrial and during trial, of an exceptional three-person team of talented, dedicated, energetic, and laudable counsel. And as the record of pretrial conferences reflects, the Court bent over backward to assure Rivera a fair process. Despite Rivera's serial violations of prison rules, and over the objections of prison officials and the

Government, the Court took extraordinary measures to assure Rivera a degree of access to discovery and counsel that was likely unparalleled in the Metropolitan Correctional Center during the pandemic.

In sum, having supervised the trial and closely evaluated the evidence, the Court is not left with any "concern that an innocent person may have been convicted." *Sanchez*, 969 F.2d at 1414. Affirming the jury's verdict would not, at all, constitute "a manifest injustice," as is required under Rule 33. Rivera's motion for a new trial is therefore denied.

## CONCLUSION

For the foregoing reasons, the Court denies Rivera's motion for a judgment of acquittal under Rule 29 and his motion for a new trial under Rule 33. The Clerk of Court is directed to terminate the motion pending at docket number 881.

Sentencing for Rivera will go forward, as scheduled, on January 20, 2022.

SO ORDERED.

Paul A. Engelmayer

_____
PAUL A. ENGELMAYER
United States District Judge

Dated: November 3, 2021
      New York, New York