

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

October 4, 2022

**BY ECF**
The Honorable Paul A. Engelmayer
United States District Judge
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

      Re:    *United States v. Justin Rivera,* **19 Cr. 131 (PAE)**

Dear Judge Engelmayer:

      The Government respectfully submits this letter in advance of the sentencing of Justin Rivera, the defendant, who was convicted at trial of conspiring to commit sex trafficking by force, fraud, or coercion, in violation of Title 18, United States Code, Section 1594(c). For the reasons explained below, a meaningful custodial sentence of at least 25 years (300 months) would be sufficient, but not greater than necessary, to serve the legitimate purposes of sentencing.

**I.    Background**

      **A.  Rivera's Sex Trafficking Conspiracy**

      The evidence at trial established that Rivera and his co-conspirators, including Lorenzo Randall and Dwayne Conley, carried out a calculated scheme to make money by luring women into prostitution, then using force and threats to keep those victims under their control.

      In May 2015, Rivera and his co-conspirators took over an abandoned house in Bohemia, New York (the "Bohemia House"), which became a hub for their sex-trafficking operation. PSR ¶ 65.[1] The co-conspirators used drugs and feigned romantic interest to draw victims into working for them. Randall acted first. He reached out to Dajia Perez online and convinced her to meet with him by feigning interest in hiring her as a manager for his purported music group. Tr. 90-105. Randall moved quickly, expressing romantic interest in Perez and asking her to give a man an erotic massage for money, promising that it would be a way for them to profit together. PSR ¶¶ 67-68. Within days, Randall had convinced Perez to move into the Bohemia House, continuing

---

[1] Citations in the form of "PSR__" are to the Presentence Report ("PSR") dated July 19, 2022. Citations in the form of "Tr.__" are to the trial transcript. Citations in the form of "GX__" are to Government Exhibits admitted at trial.

to express romantic interest and plying her with ecstasy. *Id.* Randall also had Perez rapidly escalate her prostitution, posting advertisements for her online and having her go on multiple "dates" each day. *Id.*; *see* Tr. 101-15. While Randall portrayed Perez's prostitution as benefiting both of them, he kept the money. PSR ¶ 69.

Soon after Randall recruited Perez, Rivera recruited Natalie Rodriguez to work as his prostitute, using similar techniques. Like Randall had done with Perez, Rivera feigned romantic interest in Rodriguez and began supplying her with narcotics—specifically heroin. *Id.* ¶ 65. Rivera eventually persuaded Rodriguez to move into the Bohemia House, where Rivera became her primary heroin supplier and pimp. *Id.* ¶ 66. Rivera helped arrange "dates" for Rodriguez, attended her "dates" with firearms, dictated how frequently she engaged in prostitution, and took (or at least tried to take) all of the proceeds from Rodriguez's prostitution. *Id.*; *see* Tr. 1020-45, 1496, 1504.

The parallels between how Rivera and Randall recruited their victims was not a coincidence. PSR ¶ 69. Rivera, Randall, and others in the Bohemia House coordinated with each other, so each would benefit from their sex-trafficking scheme. *Id.* At night, the men would meet in the kitchen, where they discussed the number of "dates" their respective victims had gone on and how much money they had made. Tr. 1137-42. They also shared tips about how to control and manipulate their victims. PSR ¶ 69. Through their words and actions, they created a climate of fear in the Bohemia House that forced the victims to submit to their traffickers. Rivera and his co-conspirators set rules for when Perez, Rodriguez, and other victims could leave their rooms or talk to others. Tr. 189, 1140. They also openly used, and discussed using, violence in front of the victims, sending the unmistakable signal that Perez and Rodriguez were in danger if they did not follow directions from their traffickers. *See* Tr. 1135-36.

Over time, violence and threats of violence became increasingly central to how Rivera and Randall exercised control over their victims. Rivera inflicted a range of physical and psychological abuses on Rodriguez. PSR ¶¶ 71-72. On a regular basis, Rivera beat Rodriguez, often when she challenged his control by trying to keep money from her prostitution or obtain heroin from others. *Id.* ¶ 71. Rivera carried a firearm at almost all times, including when he was with Rodriguez at the Bohemia House or on "dates." *Id.* ¶ 71. While the gun was ostensibly for protection, it was more realistically a tool to terrorize Rodriguez. *Id.* Rivera was open about possessing the gun and threatened Rodriguez with it on multiple occasions, including by pointing it at her head. *Id.*

Just as perniciously, Rivera manipulated Rodriguez's heroin addiction to control her. When Rivera met Rodriguez, she was already addicted to heroin and would suffer painful withdrawal symptoms if she did not have regular access to the drug. *Id.* ¶ 72. Rivera took over the role as Rodriguez's primary heroin supplier and reprimanded her when she tried to get heroin from others. *Id.* That allowed Rivera to coerce Rodriguez into engaging in prostitution by strategically withholding drugs from her until she had made enough money. *Id.* At the same time, Rivera often reprimanded Rodriguez for her heroin abuse, using it as a tool to lower her self-esteem and make her feel that she could not function without him. *Id.*

Rivera also played an essential tool in controlling Perez. Perez understood from Randall that Rivera was "the shooter" of the group, and Rivera regularly carried a firearm in Perez's presence. Tr. 228, 246, 268, 370; PSR ¶¶ 72-74. In one incident, Rivera wielded a firearm at Perez's mother when she came to the Bohemia House in an effort to rescue Perez from Randall's abuse. True to his reputation as the "shooter" in the group, Rivera confronted Perez's mother with "a big gun that looked like a cane." Tr. 226, 303, 896. Rivera's action intimidated Perez and her family, causing Perez to hurriedly usher her family from the Bohemia House and back to their family residence. Tr. 304-05. Perez's departure from the Bohemia House on that occasion was fleeting. Almost as soon as Perez left the Bohemia House, as Perez was being driven away from the Bohemia House, Randall began sending her threatening text messages. Tr. 306. That same night, out of fear that Randall and his co-conspirators, such as Rivera, would do violence to Perez and her family if she did not return to the Bohemia House, Perez went back to working as Randall's prostitute. Tr. 228, 298-99, 305-10, 607, 609, 611; *see* PSR ¶¶ 75-76.

Another time, Rivera stood watch outside a motel room while Randall viciously beat Perez and strangled her to the point that she thought she was going to die. Tr. 373-77. Prior to the beating, Rivera had his gun on him as he accompanied Randall and Perez to the room. Tr. 370. Rivera stood outside the room, with the door slightly ajar, as Randall made clear through the use of physical force that Perez was not to act out of line. Tr. 373-74, 377, 606. When Randall finished beating and choking Perez, Randall left the room, leaving Perez behind, and departed with Rivera.[2] Tr. 375.

The sex-trafficking conspiracy began to unravel in the fall of 2015. In late September, Perez mustered the strength to escape the Bohemia House and return home. *Id.* ¶¶ 77-79. Despite knowing the excessive psychological and physical abuse that Randall had inflicted on Perez, Rivera worked with Randall to try to lure Perez back into prostitution and plotted ways to find Randall another victim. *Id.* ¶¶ 77-80.

Rodriguez did not manage to break free from Rivera until months later. After beginning to work for Rivera in May, Rodriguez briefly stopped engaging in prostitution for him from late June through early August. The circumstances of that interlude were tragic. In late June, Rodriguez was kidnapped and brutally beaten by a group of men trying to harm Rivera, which led to her family sending her to Florida for rehab. *See* Tr. 1156-89. Rodriguez returned to New York in August and, while she managed to stay apart from Rivera for a period, ultimately began working for him again, and Rivera returned to physically and psychologically abusing her. *See, e.g.*, Tr.

---

[2] On still another occasion, Rivera participated in Randall's humiliation at the Bohemia House of another woman, Shay, who was working as a prostitute for Randall. Perez heard and saw Randall respond to Shay being "really loud" by knocking her to the floor, and then dragging Shay by her hair through the Bohemia House. Tr. 349-50. After Shay picked herself up off the floor, Rivera and Randall laughed about how Randall had knocked Shay to the floor. Tr. 353. After this display of violence and intimidation toward Shay, Randall and Rivera escorted Shay and Perez from the Bohemia House so that they could go on "dates" where they engaged in commercial sex acts. Tr. 354-55.

1189-1204. In October 2015, Rivera and Rodriguez were arrested together and found in possession of, among other things, crack cocaine that Rivera had been planning to sell. PSR ¶ 81. Rivera was held in custody pending trial, but continued to direct Rodriguez to engage in prostitution from jail and to send him money. *Id.* ¶ 82. Rodriguez did not cut ties with Rivera until early 2016. *See* Tr. 1316.

### B. Rivera's Crimes While in Bureau of Prisons Custody

#### i. Witness Tampering

After having been found guilty at trial, Rivera plotted to coerce Rodriguez into recanting her testimony, conspiring with his girlfriend (the "Rivera Girlfriend"), another individual, named Sir Murray,[3] and at least two others. *See generally* PSR ¶¶ 99-115.

Beginning no later than fall 2021, Rivera, who was then in custody at the Metropolitan Detention Center ("MDC"), used contraband cellphones to carry out a plan to have Rodriguez falsely recant her testimony and to surreptitiously record her doing so. Contemporaneous communications among Rivera, the Rivera Girlfriend, and Murray indicate that, according to the plan, once the group obtained a recording of Rodriguez recanting her testimony, they would provide it to Rivera's lawyer, presumably for the lawyer to use that recording to have Rivera's conviction vacated.[4]

In its early stages, Rivera's plan involved exacting pressure on Rodriguez's boyfriend (the "Rodriguez Boyfriend"), who like Rivera is a member of the Bloods street gang, and having the Rodriguez Boyfriend convince Rodriguez to recant her testimony. On November 4, 2021, for example, Rivera indicated to Murray via private Instagram message that Rivera had asked at least one individual (not Murray) to reach out to the Rodriguez Boyfriend but the Rodriguez Boyfriend "said he couldn't help." Murray requested the "handle" (*i.e.*, Instagram username) for the Rodriguez Boyfriend, which Rivera provided, and Murray then committed to Rivera that he would do an "investigation" and would "get next to" the Rodriguez Boyfriend. PSR ¶ 102.

Four days later, on the morning of November 8, 2021, Rivera complained to the Rivera Girlfriend that this Court denied his post-trial Rule 29 and Rule 33 motions without Rivera succeeding in getting Rodriguez to recant her testimony. Rivera messaged the Rivera Girlfriend that Rivera was "tight" because "*that other thing* wasn't situated before he [Judge Engelmayer] ruled" (emphasis added). Rivera lamented how others were not sufficiently pressuring the

---

[3] On February 7, 2022, a grand jury convened in this District returned an indictment charging Murray with one count of obstruction of justice, in violation of 18 U.S.C. §§ 1512(b)(3), 1512(j), and 2, and one count of conspiring to do the same, in violation of 18 U.S.C. §§ 1512(k) and 1512(j). *See United States v. Sir Murray*, 22 Cr. 076 (LGS). Murray's case remains pending.

[4] To be clear, the Government is not alleging or implying—nor does the Government have any evidence indicating—that Rivera's counsel had any awareness of Rivera's witness-tampering plan. The Government references contemporaneous communications by Rivera and others that reference Rivera's counsel because they bear on Rivera's goals and the plan to witness-tamper.

Rodriguez Boyfriend to coerce Rodriguez. Rivera nonetheless resolved to pressure Rodriguez into recanting her testimony, writing to the Rivera Girlfriend, "fuck that it needs to be done regardless of his [the Rodriguez Boyfriend's] feelings."

The same morning (November 8, 2021), Rivera and Murray engaged in an eight-minute video call over Instagram, during which Murray reached out via Instagram message to the Rodriguez Boyfriend for the first time with a greeting used by members of the Bloods street gang. That day, Rivera also provided Murray with Rodriguez's Instagram username. And later that morning, Rivera provided Murray with the name of Rivera's lead defense attorney and the cellphone number for the attorney.[5]

Three days later, on November 11, 2021, the Rodriguez Boyfriend replied to Murray's Instagram message from November 8th, followed by Murray sending the Rodriguez Boyfriend the following non-consecutive Instagram messages in which Murray made plain that the goal of Rivera's and his plan was to record Rodriguez recanting her testimony:

- "U cant help who u love but u gotta help make shit right bro,A REAL niggasittin up because she was Coereced into writing a statement,if she say she was coerced into writing a false statement to get a plea agreement[6] not only will they free him but they cant charge her and thats a lawsuit 4 her";

- "Get her to say they told her to say XYZ and if she didnt they wouldnt give her the plea";

- "i need u to secratly record her make sure u use his name(Justin) and make sure u get her to say they said unless she said XY&Z they wouldnt gove her a plea[.]"

That evening, Murray sent Rivera via Instagram screen-recordings of the foregoing exchanges with the Rodriguez Boyfriend, providing direct evidence for Rivera that Murray had delivered the message to the Rodriguez Boyfriend: *i.e.*, that the Rodriguez Boyfriend needed to "secratly [sic]" record Rodriguez stating that the Government "coerced" Rodriguez "into writing a false statement to get a plea agreement." The ultimate goal, as Murray explained, was to "free" Rivera.

The next day, November 12, 2021, Murray made direct contact via Instagram with Rodriguez herself. Murray expressed to Rodriguez the need for her to provide "a statement or video that's [sic] says you were told to say XY and Z in order to get your plea agreement, if you didn't say what they told you to say you wouldn't have been given the plea." PSR ¶ 106. Murray

---

[5] On October 28, 2021, Rivera provided a different individual with his lawyer's name and cellphone number. Based on the Government's investigation to date, in late October 2021 or early November 2021, that same individual approached the Rodriguez Boyfriend and communicated to him, in substance, that Rivera wished for Rodriguez to recant her testimony.

[6] Murray's use of the phrase "plea agreement" is likely a reference to the non-prosecution agreement that Rodriguez entered with the Government and pursuant to which she testified at trial.

Case 1:19-cr-00131-PAE   Document 966   Filed 10/04/22   Page 6 of 19

Page 6

pressured Rodriguez by offering her bribes from the Bloods street gang, of which Murray and Rivera are affiliated.[7] Murray also communicated threats of violence to Rodriguez, informing her "You got a beautiful son and your [sic] a Georgeous woman help me get this nigga home" and that "I know exactly where u live and be." *Id.* ¶ 107.

In response to Murray's offers of bribes and threats of violence, Rodriguez stated to Murray that she wanted to speak directly with Rivera. *Id.* Murray agreed to arrange a phone call between the two. *Id.*

Perhaps unbeknownst to Murray, three days before he first spoke to Rodriguez, on November 9, 2021, Rivera was caught with a contraband cellphone at the MDC and sent to the MDC Special Housing Unit ("SHU"). From the SHU, Rivera pressed ahead with his plan to have Rodriguez recant her testimony. On the evening of November 12, 2021 (the same evening Murray began exchanging messages with Rodriguez), Rivera's girlfriend sent a message to Murray on behalf of Rivera: "Hey BO [one of Rivera's aliases] wanted me to reach out to you and let you know he's on [sic] the box an [sic] that he needs you to take care of that ASAP. He said to hit me up for now until he's back online." *Id.* ¶ 109.

That the Rivera Girlfriend sent this message to Murray at Rivera's behest is made clear based on a recorded call that Rivera placed to the Rivera Girlfriend from the MDC on November 15, 2021. During the call, Rivera asked his girlfriend, "Did you hit, um, that person on I-G [Instagram]," with the Rivera Girlfriend responding affirmatively. The two then argued about a rumor that Rivera (rather than another man) was the father of Rodriguez's second child, prompting Rivera to question the Rivera Girlfriend about what "he" said to the Rivera Girlfriend. In response, the Rivera Girlfriend discussed how "he" had recounted for her Rodriguez's reaction to Murray's appeals for her to recant her testimony.

The same day (after the Rivera Girlfriend advised Murray that Rivera had been sent to the SHU), Murray reached back out to Rodriguez and advised her that Rivera had been sent to the SHU and, as a result, did not have access to a contraband cellphone through which Rivera could communicate with Rodriguez and answer her questions. PSR ¶ 110. Rodriguez was persistent, however, in wanting to speak with Rivera, making clear that "BO need to answer my questions" and "we'll proceed from there." *Id.*

With knowledge that he could not communicate directly with Rivera because Rivera had been sent to the SHU, on November 17, 2021, Murray exchanged messages with the Rivera Girlfriend indicating that for the plan to succeed the two needed to arrange a phone call between Rivera and Rodriguez. PSR ¶ 111. The Rivera Girlfriend endeavored to follow-through to make the plan a success.

---

[7] On October 16, 2021, Murray sent an Instagram message to Rivera's sister conveying that he (Murray) and Rivera were both members of the Bloods street gang. The same day, Rivera's sister asked Rivera over Instagram messenger about Murray, and Rivera identified for his sister that Murray is a "blood" and that Rivera himself remained a member of the Bloods but was intending to leave the gang.

The next day, on November 18, 2021, on a recorded call that Rivera placed to the Rivera Girlfriend from the MDC, Rivera and the Rivera Girlfriend had the following exchange during which they discussed the ongoing efforts to set up a phone call between Rivera and Rodriguez (*Id.* ¶ 112):

| Speaker | Content |
|---|---|
| Rivera Girlfriend | I took care of that, and he says that tell—he'll patch the line together when you are set. |
| Rivera | Who said to patch the line? |
| Rivera Girlfriend | Baby Zeus[8] |
| Rivera Girlfriend | Oh, alright. |
| Rivera Girlfriend | Just to hit him. |
| Rivera | Alright. Um, did he have another conversation with her, without you saying too much right now, did— |
| Rivera Girlfriend | Um, no, it was like enough for a screenshot and basically what I said back to you, um, he, like, called me, and, like I started telling him that same thing, basically what I was telling you. Um, and then come to find out, basically, that's exactly what she—that's exactly what was requested almost in the message that he sent me. So, I guess I, I told you that I read vibes good. |
| Rivera | What? To holler at me? |
| Rivera Girlfriend | Yeah, there's like questions she wants you to answer, and something like that |
| Rivera | Alright |

Although it is unknown what subsequent efforts (if any) Rivera made to set up a phone call with Rodriguez, his efforts that are known to the Government—and recounted above—make clear that Rivera went great lengths to achieve his broader goal of coercing Rodriguez to recant her testimony. As noted, Rivera tasked at least two individuals—Murray and another individual—with reaching out to the Rodriguez Boyfriend and provided those two individuals with the cellphone number of Rivera's attorney. Rivera agreed to have Murray reach out directly to Rodriguez and, once Rivera was in the SHU, made sure to deliver a message to Murray through the Rivera Girlfriend that Murray was to continue pressuring Rodriguez to recant her testimony.

Demonstrating full awareness that his actions were wrong, Rivera appears only to have communicated with the Rivera Girlfriend and Murray about the plan via contraband cellphone or, when on a recorded line at the MDC, in code and with an express admonition for the Rivera Girlfriend not to say "too much right now." Tellingly, to the Government's knowledge, Rivera did not act on his desire for Rodriguez to recant her testimony by having his counsel contact Rodriguez's counsel—whose involvement in this case was well known by virtue of litigation pursuant to Federal Rule of Evidence 412. Equally revealing of Rivera's state-of-mind is the fact

---

[8] At the time of this phone call, Murray's Instagram username was son.of.zeuss_.

that earlier in this case—in April 2021—Rivera had been admonished for attempting to retain the services of a private investigator without the knowledge of his counsel.

Rivera blatantly disregarded those admonishments. As he explained to the Rivera Girlfriend in January 2022 (through the use of yet another contraband cellphone), Rivera "wouldn't give a fuck wat we had to get or give [Rodriguez] if it means me coming home."

### ii. Use and Sale of Contraband in the MCC and MDC

Rivera's criminal activity while in custody in connection with this case was not limited solely to witness tampering. Even before he obtained and used cellphones at the MDC to tamper with Rodriguez, Rivera was repeatedly caught with contraband cellphones inside Bureau of Prisons ("BOP") facilities and, on one occasion, caught attempting to bribe a BOP employee to smuggle contraband into the Metropolitan Correctional Center ("MCC"), where Rivera was in custody until September 2021. *See generally* PSR ¶ 27. Rivera engaged in this conduct while enjoying rare (if not unprecedented) access to his discovery on a laptop that Rivera was permitted to maintain inside his cell 24 hours per day.

Although the Court denied a request by the Government in April 2021 to restrict Rivera's laptop use to areas outside his cell, where it would be more difficult for Rivera to improperly disseminate discovery, the Court offered the following admonishment to Rivera:

> Look, Mr. Rivera, I just need to say this to you: I think I can understand what some of the temptations must be for you to break the rules and get a contraband cell phone. But in the encyclopedia next to self-defeating behavior, there's now a picture of you with a contraband cell phone. Because by doing this in the face of the warning that I'd given you, you are now on the brink of having the laptop taken out of your cell.
>
> I don't know what the MCC's view is going to be from a prison discipline perspective, but this is presumably not a helpful thing for you. And I don't know what the result is going to be of your case. But in the event that your case ends up in a place in which some day I'm in a position of sentencing you, it's not a good look. And you have every interest in demonstrating your ability to comply with a rule like this, which shouldn't be that hard to comply with.
>
> So just from a matter of basic self-interest, please try to turn it around. It's not helping you. That's all.

Apr. 22, 2021 Pretrial Conference Tr. 28-19.

Despite having "every interest in demonstrating [his] ability to comply with" prison rules, Rivera repeatedly violated them and, worse, repeatedly committed new federal felonies while in custody. Evidence obtained from a judicially authorized search of the Rivera Girlfriend's

cellphones and Rivera's Instagram account demonstrates Rivera frequently had access to contraband cellphones while in custody in the months following his conviction. Messages exchanged between the two revealed Rivera directing his girlfriend's use of a peer-to-peer payment application, the Cash App, so that Rivera could buy and sell contraband while inside the MDC, as well as efforts by Rivera to smuggle into the MDC, among other items, marijuana, the synthetic cannabinoid, K2, and ceramic razor blades.

Rivera viewed his time at the MDC as an opportunity to make money by committing crimes. He relished lockdown conditions necessitated by the COVID-19 pandemic because they allowed him greater opportunity to sell contraband. In text messages exchanged with the Rivera Girlfriend, Rivera wrote on December 21, 2021 (after Rivera returned to the general population at MDC from the SHU, where he was placed after having been caught with a contraband cellphone in November 2021) that "hopefully" the BOP would soon bar visitors from MDC due to rising COVID-19 case-rates because increased case-rates would result in "my sentencing get[ting] pushed back" and, consequently, Rivera's designation at a correctional institution being delayed.

As Rivera saw it, the more time he spent at the MDC under lockdown conditions, the more opportunity he would have to sell contraband. Driving home his point, Rivera explained to his girlfriend that lockdowns due to COVID-19 meant "the price of everything goes up."

### C. Guidelines Calculation

The Probation Department calculates a Guidelines range of 360 months' to life imprisonment, based on a total offense level of 38 and a criminal history category of IV. PSR ¶ 187. As calculated by the Probation Department, the total offense level is based on assigning:

- A base offense level of 34, pursuant to U.S.S.G. § 2G1.1(a)(1);

- A two-level enhancement for obstruction of justice, pursuant to U.S.S.G. § 3C1.1; and

- A multiple count adjustment of two levels because, pursuant to 2G1.1(d)(1), where a sex-trafficking offense such as this one involves more than one victim, the adjustments set forth in Chapter Three, Part D are applied as if the promoting of a commercial sex act or prohibited sexual conduct in respect to each victim had been contained in a separate count of conviction. Here, Rivera is assigned two groups—corresponding to him being responsible for two victims—of equal offense levels, resulting in a two-level increase.

The Probation Department recommends a bottom-of-the-Guidelines-range sentence of 360 months' imprisonment, to be followed by five years' supervised release. PSR p. 49.

The Government agrees with the Probation Department's calculation of the Guidelines range and, as discussed herein, recommends a custodial sentence of at least 300 months, which is below the Guidelines range.

Rivera disagrees with the Probation Department's calculation in three respects. *First*, Rivera argues his base offense level should be 14, because in his view U.S.S.G. § 2G1.1(a)(1) does not apply to a conviction for *conspiring* to commit sex trafficking by force, fraud, or coercion and only applies to a conviction for the substantive offense. Rivera argues that the base offense level should instead be 14 for his conviction. Def. Sentencing Submission 9-10. *Second*, Rivera opposes assignment of a two-level enhancement for obstruction of justice, denying that he "ask[ed] or direct[ed] anyone to bribe, threaten, or otherwise coerce any witnesses who testified against him into recanting testimony." *Id.* at 22. *Third*, albeit imprecisely, Rivera appears to argue he should benefit from a two-level reduction for accepting responsibility, because he "conceded at trial that he was involved in extensive criminal activity" and "only contested his guilt with regard to the crime charged" without intending "to avoid accountability for *all* criminal conduct in 2015."[9] *Id.* at 15 (emphasis added).

Rivera requests a below-Guidelines sentence "closer to" the 132 months' custodial sentence imposed on Conley. *Id*. at 24.

## II.     Applicable Law

### A.  Calculation of Guidelines

Facts relied on at sentencing for the purpose of calculating the applicable Sentencing Guidelines must be established by a preponderance of the evidence. *United States v. Vaughn*, 430 F.3d 518, 525-26 (2d Cir. 2005). Furthermore, "a sentencing court, like a jury, may base its fact-finding on circumstantial evidence and on reasonable inferences drawn therefrom." *United States v. Gaskin*, 364 F.3d 438, 464 (2d Cir. 2004).

As always, the "sentencing court is afforded broad discretion in resolving disputed factual issues." *United States v. Ambrosio*, 129 F.3d 114, 1997 WL 701368, at *2, n.1 (2d Cir. 1997) (summary order) (citing *United States v. Ibanez*, 924 F.2d 427, 430 (2d Cir. 1991)). The sentencing court "is entitled to rely on any type of information known to it" in resolving sentencing disputes. *United States v. Tracy*, 12 F.3d 1186, 1203 (2d Cir. 1993) (citing *United States v. Carmona*, 873 F.2d 569, 574 (2d Cir. 1989)). At a sentencing hearing, the Federal Rules of Evidence do not apply, and the Court is not bound by rules governing hearsay, so long as the basis for the court's determination has indicia of reliability and is not otherwise contrary to a defendant's due process rights. *See United States v. Fatico*, 579 F.2d 707, 711 (2d Cir. 1978); *see also United States v. Martinez*, 413 F.3d 239, 242 (2d Cir. 2005) ("Both the Supreme Court and this Court, however, have consistently held that the right of confrontation does not apply to the sentencing context and does not prohibit the consideration of hearsay testimony in sentencing proceedings."). Rather, "[a]ny information or circumstance shedding light on the defendant's background, history and behavior may properly be factored into the sentencing determination." *Carmona*, 873 F.2d at 574 (citing *Williams v. New York*, 337 U.S. 241, 250–51 (1949)).

---

[9] Rivera also argues against imposition of any enhancement for leadership pursuant to U.S.S.G. § 3B1.1(c). The Government is not seeking such an enhancement.

### B. Section 3553(a)

The Guidelines still provide important guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Indeed, although *Booker* held that the Guidelines are no longer mandatory, it also held that they remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing. *Booker*, 543 U.S. at 264. As the Supreme Court stated, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After calculating the Guidelines range, a sentencing judge must consider seven factors outlined in Title 18, United States Code, Section 3553(a): (1) "the nature and circumstances of the offense and the history and characteristics of the defendant"; (2) the four legitimate purposes of sentencing, as set forth below; (3) "the kinds of sentences available"; (4) the Guidelines range itself; (5) any relevant policy statement by the Sentencing Commission; (6) "the need to avoid unwarranted sentence disparities among defendants"; and (7) "the need to provide restitution to any victims," 18 U.S.C. § 3553(a)(l)-(7). See *Gall*, 552 U.S. at 50 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B)  to afford adequate deterrence to criminal conduct;
(C)  to protect the public from further crimes of the defendant;
(D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2).

### III. Discussion

#### A. The Guidelines Range Is 360 Months' to Life Imprisonment

##### i. The Base Offense Level for Conspiracy to Commit Sex Trafficking by Force, Fraud, or Coercion is 34

Relying on the Ninth Circuit's opinion in *United States v. Wei Lin*, 841 F.3d 823, 825 (9th Cir. 2016), Rivera argues the base offense level pursuant to U.S.S.G. § 2G1.1(a) should be 14 rather than 34. Under that Guidelines provision, the base offense level is 34 "if the offense of conviction is 18 U.S.C. § 1591(b)(1); or 14, otherwise." In *Wei Lin*, the Ninth Circuit found that the base offense level of 34 applies only when the defendant has been convicted of a substantive sex trafficking offense by force, fraud, or coercion or if the victim is under fourteen years of age, pursuant to 18 U.S.C. § 1591(b)(1), and does *not* apply when the defendant has been convicted of conspiring to do the same pursuant to 18 U.S.C. § 1594(c). *Wei Lin*, 841 F.3d at 827.

The holding and reasoning of *Wei Lin* is wrong. Although the Second Circuit has yet to weigh in on the issue, the Third, Eighth, and Eleventh Circuits have rejected the Ninth Circuit's interpretation of the Guidelines, instead finding that the base offense level for a sex trafficking conspiracy, even when standing alone, is the same as the base offense level for the substantive offense. *United States v. Sims*, 957 F.3d 362, 363 (3d Cir. 2019), *cert denied*, 141 S.Ct. 404; *United States v. Carter*, 960 F.3d 1007 (8th Cir. 2020); *United States v. Valdez*, No. 19-12522, 2021 WL 3478402 (11th Cir. Aug. 9, 2021). Courts in this District have reached the same conclusion. *See, e.g.*, *United States v. Vanier*, No. 18 Cr. 873 (VSB), 2021 WL 5989773 at *12 n.11 (S.D.N.Y. Dec. 17, 2021) ("I agree with Third and the Eighth Circuits. As the Third Circuit noted in *Sims*, application of the Ninth Circuit's decision would lead to 'absurd results' by punishing far more leniently a defendant convicted under 1594(c) but who engaged in the same exact conduct as a defendant who was convicted of the substantive offense."); *United States v. Pierre-Louis*, 16 Cr. 541 (CM), 2019 WL 2235886, at *1 (S.D.N.Y. May 15, 2019); *United States v. Goddard*, 17 Cr. 439 (LAP), 2018 WL 4440503, at *2 (S.D.N.Y. Sept. 17, 2018).

All of these cases that have rejected *Wei Lin*'s conclusion have generally followed the plain language of the Guidelines to reach the unavoidable conclusion that calculating the offense level for a *conspiracy* to violate 18 U.S.C. § 1591(b) must be achieved by following the Guidelines' instructions for *conspiracies*. *See Carter*, 960 F.3d at 1014; *Sims*, 967 F.3d at 364; *Valdez*, 2021 WL 3478402 at *5. *Cf. United States v. Manas*, 272 F.3d 159, 167 (2d Cir. 2001) (meaning of individual Guidelines provisions to be interpreted based on context and structure of Guidelines as a whole).

Under the Guidelines' mandated approach for calculating the base offense level for conspiracies, when a conviction involves a conspiracy offense, Section 2X1.1 "as well as the guideline . . . for the substantive offense" are to be consulted. U.S.S.G. §1B1.2. Section 2X1.1 applies to conspiracies that are not "expressly covered by other offense guidelines" and provides a list of those conspiracies that are, in fact, covered by other offense guidelines. U.S.S.G. 2X1.1 Application Note 1. Because none of the specific offense guidelines applicable to a conviction under Section 1594(c) appears on that list, Section 2X1.1 applies to a conviction under Section 1594(c). Section 2X1.1 calculates "[t]he base offense level from the guidelines for the substantive offense, plus any adjustments from such guideline for any intended offense conduct that can be established with reasonable certainty."

Thus, the base level for a conspiracy conviction is "the same as that for the substantive offense." U.S.S.G. § 2X1.1. Application Note 2. *See also Stinson v. United States*, 508 U.S. 36, 38 (1993) ("[C]ommentary that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or entails a plainly erroneous reading of, the guideline."). Here, the base offense level for the substantive offense of sex trafficking by force, fraud, or coercion is 34. *A priori*, the base offense level for conspiring to commit that substantive offense is 34.

Rivera may argue that Section 2X1.1's operation cannot be squared with Section 2G1.1(a)'s more specific directive that the base offense level of 34 only applies if the "*offense of conviction* is 18 U.S.C. § 1591(b)(1)" (emphasis added) and that where, as here, a defendant was

not convicted of that statute the base offense level cannot be 34. That argument would be wrong. As the Third Circuit observed in *Sims*, the Guidelines themselves define the phrase "offense of conviction" to mean "the offense *conduct* charged in the count of the indictment or information of which the defendant was convicted." U.S.S.G. § 1B1.2(a) (emphasis added); *Sims*, 957 F.3d at 365.

The offense conduct charged in Count One of the Indictment alleged that Rivera and others conspired to engage in sex trafficking by force, fraud, or coercion. *See* Indictment, ECF No. 1. Having been convicted on that count, Rivera was convicted for the same offense conduct underlying the substantive violation. Accordingly, that Section 2G1.1(a) states that the base offense level of 34 applies if the "offense of conviction is 18 U.S.C. § 1591(b)(1)" supports—rather than undermines—the conclusion that Rivera's base offense level is 34.

### ii. A Two-Level Enhancement for Obstruction of Justice Is Warranted

The Guidelines mandate a two-level increase in a defendant's offense level "[i]f (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct." U.S.S.G. § 3C1.1. The enhancement applies to, among other conduct, "threatening, intimidating, or otherwise unlawfully influencing a co-defendant, witnesses, or juror, directly or indirectly, or attempting to do so." U.S.S.G. § 3C1.1 Application Note 4(A), (B). "The facts necessary to support an obstruction-of-justice enhancement need be proven only by a preponderance of the evidence." *United States v. Khedr*, 343 F.3d 96, 102 (2d Cir. 2003).

As outlined above, Rivera made substantial efforts following his conviction at trial to have Rodriguez falsely recant her testimony. He reached out to at least two associates with requests that they pressure Rodriguez to recant her testimony. He insisted on receiving updates from those associates on their progress, and he had his girlfriend serve as an intermediary with Murray once Rivera was sent to the SHU. In executing this plan, Murray kept Rivera abreast on his tampering efforts by furnishing Rivera (directly or through the Rivera Girlfriend) with screenshots of the messages that Murray exchanged with Rodriguez, including those messages in which Murray offered Rodriguez bribes to recant her testimony and threatened her with violence.

Rivera's blanket and conclusory denial of witness tampering—*i.e.*, that "anyone who may have used [improper] means" to convince Rodriguez to recant her testimony "did so of their own volition" (Def. Sentencing Submission 22)—strains credulity. As noted, Rivera had been warned in spring 2021 that the manner by which he was to investigate his case was through counsel—and certainly not through deputizing his fellow gang members to serve as private investigators. What is more, Rivera made every effort to conceal his plan from authorities, relying on contraband cellphones or speaking in code on recorded phone lines. Rivera's co-conspirators were not improvising when attempting to persuade Rodriguez to recant her testimony. To the contrary, they were working off Rivera's script.

In short, Rivera's unabashed witness tampering amply supports application of the obstruction enhancement. *United States v. Peterson*, 385 F.3d 127, 140-41 (2d Cir. 2004) (finding

obstruction enhancement applicable based on letters in which defendant urged coconspirators "not to cooperate with the Government, to maintain certain stories and positions, and to repeat certain versions of events that were not true").

### iii. Rivera Is Not Entitled to a Two-Level Reduction for Acceptance of Responsibility

Rivera is not entitled to a two-level reduction of his combined offense level for acceptance of responsibility. The applicable Guidelines section provides: "If the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." U.S.S.G. § 3E1.1(a). The defendant bears the burden of establishing his entitlement to this sentencing adjustment. *United States v. Broxmeyer*, 699 F.3d 265, 284 (2d Cir. 2012).

Rivera has not—and cannot—bear his burden. Insofar as the two-level reduction for acceptance of responsibility "is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, *and only then admits guilt and expresses remorse*," U.S.S.G. 3E1.1 Application Note 2 (emphasis added), it clearly does not apply to a defendant, like Rivera, who proceeds to trial, is convicted, and continues to *deny guilt and express no remorse whatsoever*.

While the Guidelines contemplate a reduction for acceptance of responsibility may be appropriate for a defendant who "goes to trial to assert and preserve issues that do not relate to factual guilt," in that instance the acceptance of responsibility adjustment "will be based primarily upon pre-trial statements and conduct." U.S.S.G. 3E1.1 Application Note 2. But Rivera cannot point to any pretrial statements or conduct demonstrating an acceptance of responsibility despite having ample opportunity to make such statements or engage in such conduct.

In any event, Rivera's defense was (and is) aimed directly at disputing factual guilt. In his sentencing submission, Rivera hints that he has merely raised "a technical defense"[10] (whatever that might be) but, as he did at trial, throughout his sentencing submission Rivera denies that he conspired with anyone else to sex-traffic Perez or that Rodriguez's commercial sex acts were undertaken because of the use of force, fraud, and coercion. Def. Sentencing Submission 6 (Rodriguez "brought him into *her* lifestyle" (emphasis in original); "Justin was not involved in Perez's prostitution in any way . . . ."). Rivera therefore cannot successfully paint himself as having asserted defenses that have nothing to do with his factual guilt.

Yet, even if Rivera had offered an expression of remorse following his conviction or had only asserted a defense unrelated to factual guilt (to be clear, he has not satisfied either of these conditions), he still would not be entitled to an adjustment for acceptance of responsibility in light of his post-conviction witness tampering. Rivera's efforts to pressure Rodriguez to lie and recant her testimony manifestly prove that he has not accepted responsibility. *See United States v. Thompson*, 76 F.3d 442, 458 (2d Cir. 1996) (affirming denial of two-point adjustment for acceptance of responsibility for defendant who had "urg[ed] other coconspirators to refuse to

---

[10] Def. Sentencing Submission 15.

cooperate with the authorities, and urg[ed] Will [a co-conspirator] to recant a truthful statement already made to the authorities").

### B. The Court Should Impose a Meaningful Custodial Sentence of at least 300 Months

The Government respectfully submits that a custodial sentence of at least 300 months' imprisonment would be sufficient, but not greater than necessary, to achieve the legitimate purposes of sentencing.

Rivera's lengthy criminal history is important context for understanding the severity of the instant offense. Simply put, Rivera has consistently demonstrated that he is a grave danger to others and has no regard for the legal system. Rivera's first arrest came in September 2007, after he and another person punched and kicked a victim in the head, breaking the victim's nose and eye socket. PSR ¶ 139. The next month, while on pretrial release from that arrest, Rivera and others broke into another victim's home, beat the victim, and stole property from him. *Id.* ¶ 140. Rivera ultimately pled guilty, in early 2008, to third-degree assault and second-degree attempted robbery for those crimes and was sentenced to 90 days' and six months' imprisonment, respectively. *Id.* ¶¶ 139-40.

After completing those terms of incarceration in mid-2008, Rivera promptly returned to violent crime. In November 2008, Rivera was arrested for an assault involving physical injury. *Id.* ¶ 141. While on pre-trial release, Rivera reoffended again. In December, he gave false information to police officers after being stopped for a traffic infraction. *Id.* ¶ 142. And in February 2009, he was arrested for possessing crack cocaine and a loaded firearm. *Id.* ¶ 143. For those crimes, Rivera pled guilty in the summer of 2009 to false personation and attempted criminal possession of a weapon in the second-degree, receiving a sentence of six years' imprisonment and five years' post-release supervision for the latter. *Id.* ¶¶ 142-43.[11] Rivera was released to parole in July 2014, quickly had his parole revoked in November 2014, and then was released again in March 2015. As explained above, the very next month, Rivera moved into the Bohemia House and, by May, was conspiring with others to traffic Rodriguez and Perez, dealing drugs, using firearms, and lying to his parole officer about his whereabouts and activities.[12]

This prologue to Rivera's most recent crime is exceptional. Nothing has deterred Rivera from committing violent, or otherwise dangerous, crimes. Not pre-trial release. Not prison sentences. Not parole. He has demonstrated time and again a disregard for the law and for the safety of others for over a decade. While the Government credits that Rivera had an abnormally difficult childhood, his incessant return to dangerous crime shows a troubling resistance to

---

[11] While serving that sentence, Rivera also pled guilty to third-degree assault for his November 2008 crime. *Id.* ¶ 141.

[12] The PSR incorrectly states that Rivera lied about his residence at the time of his February 2009 arrest for possessing a weapon. *See* PSR ¶ 143. Rivera moved into the Bohemia House in or about May 2015 and, between moving there and being arrested again in October 2015, consistently lied to his parole officer about his residence and activities. *See id.*

Case 1:19-cr-00131-PAE   Document 966   Filed 10/04/22   Page 16 of 19

Page 16

understanding that endangering others is unacceptable and his own past, of course, cannot negate his agency or mitigate the harm he has visited on others.

The instant offense was a multi-month display of Rivera's callous indifference to the wellbeing of others. Rather than using his time on parole to build a law-abiding life, Rivera chose to try his hand at making money by selling drugs and forcing women to give him the proceeds of their prostitution. The Government will not recount all the details of Rivera's crime here: it has summarized those facts above, and this Court paid close attention through trial. But it bears emphasizing that Rivera was a central player in inflicting deep psychological and physical abuse on Rodriguez and Perez. He was Rodriguez's main tormenter, taking advantage of her romantic attachment to him, manipulating her heroin addiction, beating her, and terrorizing her with firearms. Rivera was also an important supporting figure in Perez's abuse, scaring Perez's family away from the Bohemia House when they tried to rescue her, standing guard when Randall abused her, and openly carrying firearms in a manner that left the clear impression to Perez that breaking free of the Bohemia House would be a dangerous endeavor. To Rivera, the victims in this case were tools for him and his friend to make money, and nothing more. Their safety and wellbeing was not even an afterthought.

Notably, nothing about Rivera's outlook appears to have changed since the instant offense. Rivera was separated from Rodriguez and the Bohemia House when he was arrested in October 2015, but he continued to try to traffic Rodriguez and fantasize about plans for pimping other women while in prison. *See* GX 1216, GX S-10 ¶ 1.o (January 9, 2016 call between Rivera and Rodriguez in which Rivera instructs Rodriguez to recruit other women to work as prostitutes for Rivera). Then, less than a year after he was released from prison, he was arrested again for possessing a loaded weapon and held in custody until his arrest in this case, when he was transferred to federal custody. *See* PSR ¶ 145. Between that transfer and his trial, Rivera consistently violated prison rules, including by fighting, possessing a dangerous weapon, bribing an official, and possessing contraband cellphones. *See id.* ¶ 27.

Rivera's conviction at trial did not change his tune. Despite a jury unanimously finding him guilty beyond a reasonable doubt, Rivera has never accepted responsibility for his actions or expressed any remorse for what he and his co-conspirators did at the Bohemia House. Instead, Rivera devoted his efforts after trial to participating in yet another criminal scheme to use bribes and threats of violence to persuade Rodriguez to recant her trial testimony. PSR ¶¶ 99-115.

This post-trial conduct is important for at least three reasons. *First*, the scheme to illegally induce Rodriguez—a victim in this case upon whom Rivera has already inflicted extensive abuse—to recant her testimony is independently blameworthy and warrants punishment. *Second*, despite having every incentive to adhere to prison rules and regulations after having sustained the most significant criminal conviction of his life, Rivera flouted those rules and regulations in the extreme, leaving little (if any) doubt that a significant sentence is necessary to further the goal of individual deterrence. And *third*, Rivera's steadfast refusal to accept responsibility or express any shred of remorse leaves no reason to believe Rivera will change his ways in the near future.

Rivera's criminal history, the nature of the instant offense, his lack of remorse, and his efforts to obstruct justice demand a substantial term of no fewer than 25 years' imprisonment.

That sentence is lengthy, but it is necessary to reflect the severity of Rivera's crimes, to prevent him from harming more people, and to deter him from returning to wrongdoing when he completes his term of imprisonment.

A sentence of at least 25 years' imprisonment would be consistent with sentences that other sex traffickers have recently received. In the past several years, courts in this district have imposed sentences of more than 20 years' imprisonment for sex-trafficking offenses involving one or two victims. *See, e.g.*, *United States v. Bazemore*, 19 Cr. 6 (AT) (27-year sentence); *United States v. Dupigny*, 18 Cr. 528 (25-year sentence); *United States v. Goddard*, 17 Cr. 439 (LAP) (24-year sentence); *United States v. Young*, 19 Cr. 256 (SHS) (20-year sentence).

A 25-year sentence is also appropriate within the context of this case. As Rivera notes, this Court sentenced his co-conspirator from the Bohemia House, Dwayne Conley, to a term of 132 months' imprisonment, which was within the Guidelines Range of 120 to 150 months' imprisonment. Rivera should receive a substantially higher sentence than Conley for at least three reasons. *First*, Rivera not only possessed firearms throughout the instant offense, but regularly used those weapons to threaten Rodriguez and help Randall enforce his control over Perez. That brazen use of a deadly weapon, in the context of Rivera's extensive history of violent assaults and firearm convictions, highlights the exceptional danger that Rivera poses to the community.

*Second*, and relatedly, the need for incapacitation is particularly acute with respect to Rivera. He has consistently demonstrated a penchant for violence that is not deterrable by supervision. While Conley also had a significant criminal history, his convictions preceding the instant offense were largely for drug trafficking, rather than violence, and due to his age (Conley was 52 at the time of sentencing) a shorter sentence was necessary to ensure that Conley would not be free again until he was at an age when re-offending was particularly unlikely.

*Third*, while Conley did not receive a reduced offense level for acceptance of responsibility due to his efforts to obstruct justice prior to pleading guilty, Conley's obstructive conduct was of a kind and degree that is dwarfed by Rivera's. During the pretrial phase of this case, Conley asked a witness to call Conley's lawyer and lie to the lawyer in a manner that would undermine prior recorded statements the witness made that inculpated Conley in sex-trafficking a particular victim. The next day, when the witness did not call Conley's lawyer, Conley sent the witness a text message apologizing for his request. Conley did not engage in any subsequent tampering of the witness.

Unlike Rivera, Conley never attempted to undermine his prosecution (and the entire judicial process) by having a witness falsely accuse misconduct against the Government. And although Conley requested that a witness lie to his lawyer, Conley did not (as Rivera did) offer the witness a bribe, threaten her with violence, approach her loved ones, or ask others to engage in such conduct on his behalf. Nor did Conley, once rebuffed initially, make any subsequent efforts to have the witness lie. Rivera, by contrast, did so repeatedly and by adopting multiple means and methods.

Conley eventually acknowledged his wrongdoing and expressed remorse to the Court. Rivera has never done either. That is important at sentencing because Rivera's lack of remorse

reflects his character and willingness to change his ways. It is, in the Government's eyes, difficult to accept that Rivera is ready to turn a page in his life when, unlike Conley, he refuses to be accountable for his past. That makes a lengthy sentence to protect the public and specifically deter Rivera from future crimes all the more necessary.

### C. The Court Should Order Forfeiture of $27,000 and Restitution of $87,000

In addition to any custodial sentence and subsequent term of supervised release, the Court should impose an order of forfeiture of $27,000 and an order of restitution of $87,000. As set forth below, these amounts represent, respectively, the proceeds of Rodriguez's sex trafficking that Rivera received from her, and the conspiracy's unjust enrichment from trafficking Rodriguez and Perez.

In calculating both forfeiture and restitution, the Court need only make a reasonable estimate, based on available evidence, of the amounts to be forfeited and repaid to victims. *See United States v. Treacy*, 639 F.3d 32, 48 (2d Cir. 2011) (in calculating forfeiture amount, court "need only make a reasonable estimate of the loss, given the available information" (internal citations and quotation marks omitted)); *United States v. Gushlak*, 728 F.3d 184, 195-96 (2d Cir. 2013) ("reasonable approximation" for restitution "will suffice, especially in cases in which an exact dollar amount is inherently incalculable" (internal citations omitted)).

With respect to forfeiture, the Government estimates Rivera received proceeds from Rodriguez of at least $27,000. The Government reaches this estimate by making the following conservative assumptions, which themselves are based on Rodriguez's testimony: (1) Rivera trafficked Rodriguez from May 2015 into early 2016, although there were periods where Rodriguez did not work exclusively, or at all, for Rivera. Conservatively assuming Rodriguez only worked for Rivera for approximately four months and went on dates and went on dates "every other day," (notwithstanding Rodriguez's testimony that she went on dates "If not every day, every other day"), that is approximately 60 days of prostitution for Rivera; (2) Rodriguez went on three dates per day for Rivera (notwithstanding her testimony that she went on two to five dates per day); (3) at Rivera's direction, Rodriguez charged $150 per date (notwithstanding Rodriguez's testimony that she charged customers at Rivera's direction between $100 and $200 or more); and (4) with some exceptions, Rodriguez gave Rivera all of the proceeds of her commercial sex acts. Tr. 1044-48, 1195-96. In sum, the Government calculates that Rivera received $450 in proceeds per day from commercial sex acts (three dates per day at $150 per date) over, in the aggregate and conservatively taking account of periods when Rodriguez did not work for Rivera, 60 days. Accordingly, Rivera's forfeiture obligation is $27,000 ($450 x 60). 18 U.S.C. § 1594(d)(2).

With respect to restitution, Rivera owes his victims "the full amount of" their "losses," which is measured by personal losses sustained by the victims, as defined by 18 U.S.C. 2259(c)(2), *plus* the economic value of the victims' services, which is measured by "the greater of [1] the gross income or value to the defendant of the victim's services or labor or [2] the value of the victim's labor as guaranteed under the minimum wage and overtime guarantees of the Fair Labor Standards Act." 18 U.S.C. § 1593(b)(3). To achieve a conservative estimate of the victims' respective losses, the Government is not seeking restitution for personal losses—such as costs associated with

psychological, psychiatric, or medical services or lost income—and is only seeking restitution for the economic value of the victims' services.

For Rodriguez, the economic value of her labor should be measured by the "gross income" from her commercial sex acts, which easily surpasses the value of her labor as guaranteed under minimum wage laws (the federal minimum wage in 2015 was $7.25 per hour). Accordingly, the restitution owed to Rodriguez is $27,000, which is equal to the Rivera's proceeds from trafficking her, because that is equal to the gross income from Rivera's trafficking of Rodriguez.

For Perez, the Government estimates that Rivera owes restitution of $60,000 based on the following conservative assumptions, which themselves are based on Perez's testimony: (1) Perez was trafficked for four months and went on dates on a daily basis (120 days); (2) Perez went on dates twice per day (notwithstanding her testimony that she began her time with Randall by going on one to three dates per day and at times went on five or six dates per day); (3) Perez charged on average $250 per date (notwithstanding that at times she charged $500 per date); and (4) Randall received all proceeds of Perez's commercial sex acts. Tr. 102, 115-16. In sum, the Government calculates that the "gross income" derived from Perez's commercial sex acts is $500 per day (two dates of $250 per day) for 120 days. That amount, like the amount owed to Rodriguez, easily surpasses the value of Perez's labor if it had been compensated at the prevailing minimum wage. Accordingly, the gross income derived from Perez's commercial sex acts is conservatively estimated as $60,000 ($500 x 120). 18 U.S.C. §§ 1593(a), (b).

Prior to sentencing, the Government will supply the Court with proposed orders of forfeiture and restitution reflecting the foregoing calculations.

### IV. Conclusion

For the reasons set forth above, the Government respectfully requests that the Court impose a meaningful custodial sentence of at least 300 months, and order forfeiture and restitution consistent with the Government's calculations.

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:    /s/
Thomas S. Burnett
Daniel H. Wolf
Assistant United States Attorneys
(212) 637-1064/2337

cc:    Defense counsel (*by ECF*)